Good morning, Your Honor. I represent appellants, in particular the direct purchaser dentists, and my co-counsel, Mr. Pierce, represents the indirect purchasers. So this is an appeal from summary judgment granted for the defendant Align on a Section 2 antitrust claim. The trial court, to be clear, reached a conclusion we believe correct that plaintiffs had provided prima facie evidence sufficient to get to a jury that Align cut off dentists from using, from ordering Invisalign aligners through three-shapes scanners, and in so doing that Align suffered a short-term loss, the sales of tens of millions of dollars of Invisalign, as well as the loss of goodwill of dentists, and then long-term gain, long-term gain, hundreds of millions of dollars of overcharges that it was able to impose on its products as a result of the refusal to deal. Where the trial court ruled against us was based on a justification for the refusal to deal that the defendant Align put forward, and that justification, the only one it ruled on that Align raises on appeal in defense of summary judgment is that Align was motivated to protect Align's scanner patent rights against three-shape and patent litigation. And I want to focus on one primary flaw and two legal consequences of that primary flaw on appeal. The primary flaw is that all of the expert evidence, all of it, cuts against Align's position that the refusal to deal strengthened its position in the patent, in the scanner patent litigation. This is not a battle of the experts. This is a very, very unusual situation in which the experts agree in a way that favors plaintiffs on key issues, and then on the remaining key issues, plaintiffs put forward expert opinion on patent law that supports their position, and defendant's expert, Mr. Stoll, declined to opine on the very issue that he deemed, he identified as relevant. But before you get further into the facts of this case, could you sort of outline for us your view of what the legal rule is where you have a defendant that refuses to deal in part for anti-competitive reasons and in part for some legitimate business justification? How should we analyze that? Sure. So, and this was the source of some confusion below. Thank you for the opportunity to clarify. So two pieces here. One is, it is not sufficient that a defendant has a nonpretextual justification for its refusal to deal. That justification also must be procompetitive. It could have a sincere but nonprocompetitive justification that is fatal to its position. And that's true under Qualcomm. It's true under the Supreme Court and Ninth Circuit's opinions in Eastman Kodak. For a justification for a refusal to deal to succeed, like other Section 2 justifications, it actually has to be procompetitive. And that comes out of two steps in the analysis. The first step, which we're bracketing for the moment, is plaintiffs must show anti-competitive effects. Trial court said we did that. The defendant then must offer a nonpretextual procompetitive justification. And then in the third stage, plaintiff has to show that the anti-competitive effects outweigh the procompetitive effects. If a defendant does not show procompetitive effects, and this evidence establishes that a line fails, or at least there's a genuine dispute of material fact about any procompetitive effects, it follows that the justification is inadequate, and that in the third step, that the anti-competitive effects must outweigh nothing, the procompetitive effects for which there is no proof on the table. And so one of the ----  Can you clarify, what is the metric that we use to evaluate, like, which effect is bigger than the other? Yes. That is a very hard question that the Court need not address in this case. Well, I mean, we might need to address it, because if it doesn't have a good answer, that might be a reason to think that a rule that requires us to do that is a bad rule. So in some instances, I think that these effects are quantifiable. And when they are, that's relatively easy. For example, in our case, we showed hundreds of millions of dollars. We have evidence of hundreds of millions of dollars of overcharges. Here, because there's no evidence of a procompetitive effect, no evidence that aligns refusal to deal with three-shape-strengthened scanner patent rights, the evidence is it actually hurt aligned scanner patent rights, that's a very easy weighing. It is the law generally that weighing is what takes place in the third step. That's what the Ninth Circuit said in Qualcomm. I think that in some cases, these numbers are indeed quantifiable. Who makes that decision? So I would say it's the ordinary summary judgment standard applies. Let's say you've raised at least a genuine tribal issue of fact maybe on the justification. Then it goes to the jury. Goes to the jury. And the jury had to do it. And so the judge instructs the jury that they need to balance? Yes. That is what the court should do, that we have the Seventh Amendment. Even in antitrust cases, there's a right to trial by jury. And so among one of many challenging issues in an antitrust case, it goes to the jury to assess whether the procompetitive justifications outweigh the anticompetitive effects or vice versa. I do want to emphasize on the second point, though, the justification does at least have to be procompetitive. And there, too, there is evidence sufficient for us to say that a line should not have won summary judgment on that issue. But that at least should have gone to the jury. And that's much more straightforward. It doesn't require the kind of nuance that balancing does. The second thing I would say in terms of the failures that result, so I do want to ask you, Your Honor, I think I didn't fully respond. There is another issue that's raised about mixed motive versus pure motive. We – I think the Court below conflated two separate issues, among others. There – we conceded, and what we conceded to the Court below was that from – for purposes of summary judgment, a mixed motive is sufficient for a line to show nonpretext. What we did not concede, and in fact, in our briefs, and I can cite to the record in an oral argument, we asserted the opposite, was that nonpretext, we said, is not enough by itself. The justification also has to be procompetitive. And because, in this case, all of the evidence shows that a line actually hurt its scanner patent rights through its refusal to deal, summary judgment should have been denied on that basis, and the Court did not address that issue below. So that's the – I think that's a more complete answer. So your view – and correct me if I – if I have this wrong. Your view is that there has to be a nonpretextual business justification that is procompetitive, and once they've presented that, then the trier effect is supposed to weigh whether that effect dominates over the anticompetitive effects?  And that's what Qualcomm said in her refusal to deal case, I believe at page 991. That's what – and this is a consistent view, especially at least with that second piece, with the Supreme Court's decision in Eastman-Kodak, where it rejected one potential procompetitive justification. There were three put forward. Two, it said the evidence was mixed, and so the jury had to decide whether the justification was nonpretextual. But the third, the free-riding justification, the Court said, that's not procompetitive in this context and, therefore, not legally cognizable. And that's here, as a matter of evidence, rather than as a matter of law, is true as well, because here all of the evidence shows that the experts agreed on all material points, or their experts refrained from opining about the effects of the refusal to deal on a liner scan or patent rights. Did you want to reserve your time? I do. I'd like to reserve my time. Thank you very much. Mr. Pierce. Good morning, Your Honors. Rio Pierce on behalf of the Snow Appellants. I wanted in a limited time to briefly touch on two additional grounds for reversal. The first is that the district court acknowledged specifically that there was abundant evidence in the record that a line's refusal to deal was motivated by, at least in part, by anticompetitive malice and that it represented a short-term profit sacrifice. As the Supreme Court recognized in Trinko, those are hallmarks of what makes refusals to deal anticompetitive. One error of the district court was that it refused to consider the refusal to deal as part of the overall Section 2 claim that was alleged, which was a scheme, a course of conduct, to monopolize the market. And a long line of Supreme Court cases, including Continental Ore and Swift, talk about when you have a conspiracy, when you have an antitrust claim, you have to look at the overall course of conduct. That's specifically what this court said in City of Anaheim as well. It is not proper to focus on specific individual acts while ignoring their overall combined effect. So in addition to the refusal to deal, which has hallmarks of the kind of refusals to deal that are exclusionary, you also have bundling, where the Snow Plaintiffs presented specific evidence that the align's fusion bundle resulted in below variable cost pricing, which in Cascade Health, this court specifically talked about, can exclude rivals who can't match the discounts. And you have even qualitative evidence in the record from align's CEO talking about how they're going to crank up the bundling after their rival was harmed by the termination of interoperability because their rival can't match the bundle discount. So again, that's a classic example of where a bundle discount can be exclusionary. Did you preserve a bundling claim as a distinct claim? Well, we never have had a separate bundling claim. We've always had a single Section 2 claim where we've always said there were multiple types of anti-competitive conduct part of the claim. And how do we, or I guess the district court, how is it supposed to evaluate that? So if you've met the elements of a refusal to deal claim, then you would win on that, I suppose. But so if you haven't, you don't quite have a refusal to deal claim, you're not asserting an independent bundling claim, what's the district court supposed to do with almost refusal to deal plus almost bundling? It's a fair question, Your Honor. What I would say specifically on the bundling is that the Ninth Circuit has a specific test on bundling. Are you offering your product at a below your variable cost? That's the specific test that was enunciated in Cascade Health. We put forward specific expert evidence, undisputed and unchallenged by align, that the bundling represented sales below their average variable cost. So there is a specific Ninth Circuit test for when a bundle discount is exclusionary. We put forward quantitative evidence from an expert that we satisfied that test, not challenged, not doberated by align, never addressed by the district court. So there is, especially for the bundling, a specific test for when it's exclusionary that we put forward evidence to satisfy that the district court simply didn't address. And then in addition, there's the exclusive dealing where you have facially exclusionary contracts that cover approximately 35 percent of Invisalign orders. You have, again, qualitative evidence from align talking about how the programs are designed to thwart competitors, ward off competitive threat. And then stepping back, because, again, what we've alleged is a Section 2 claim, we put forward evidence from an expert saying that this conduct in the aggregate foreclosed up to 55 percent of the market and under when you put it all together. So I think one way that the district court should have addressed it was look at our specific evidence that this foreclosed up to 55 percent of the market, which under cases like Twin Cities is clearly enough to show, at least at the summary judgment stage, to show substantial foreclosure. And so there is a lot of evidence in the record to show that we have the overall claim shows substantial foreclosure in the market. As I read the district court's decision and some of the background, he seemed to focus on the fact that he viewed it as an refusal to deal claim. Yes. Period. And then he, when he thought about these other two bases for a Section 2 claim, he just said, well, they're not, without the refusal to claim, without the refusal to deal aspect of this Section 2 claim, these other two bases just don't cut it.  It was somewhat mystifying that the district court did take that approach to summary judgment, because at the motion-to-dismiss stage, he specifically said that they all, in aggregate, constituted a strong overall Section 2 claim. I would direct your honors to the closely analogous recent Fourth Circuit case, Duke Energy, where, again, you had an overall scheme that was alleged, just like here, where the district court erred at summary judgment by treating each aspect of the scheme individually, and the Fourth Circuit reversed and found that you need to look at the overall scheme, that the refusal to deal, even if it wasn't independently actionable, had the same hallmarks of anti-competitive conduct that are present here, anti-competitive malice, profit sacrifice, and that it should be part of the claim. So let me ask you this. If we were to agree with him on the refusal to deal aspect, do we need to go on and ask, well, is there a viable bundling claim? Well, I guess I think under what this Court said in the City of Anaheim, you know, even perfectly lawful conduct can contribute to a Section 2 claim. And so, yes, I think your honors should go on and look at the overall evidence, even if your honors find that the refusal to deal is not an independent stand-alone claim, which, again, we never brought an independent stand-alone claim. I think you should go forward, look at the evidence that we have on substantial foreclosure, and evaluate the overall claim, just like the Court did in Duke Energy. I only have 30 seconds left. And if we were to conclude that the district court erred on the refusal to deal aspect, is that just these other two bases just move right along? We don't have to give any attention to them? Well, I think you should – that's an interesting question. I mean, I think – I'm not sure the extent to which a line has challenged them. I think if you remanded and found that the court had erred on refusal to deal, they would be part of the case. They're part of the case that we intend to litigate. We've always said it's a single Section 2 claim. So I had 30 seconds on privilege, if I could beg the Court's courtesy. Very briefly. So, again, I think the record's pretty clear that the Court's privilege record rulings were quite strange, to be honest. A line from an early stage in this case has made clear that they are basically relying on an advice of counsel defense. They said they – their CEO testified. He terminated after he was convinced by advice from counsel that he needed to terminate because of the patent litigation. We've repeatedly tried to get that legal advice. They blocked discovery into that legal advice. They asserted privilege as a shield. And then when it came to summary judgment in their papers, in their briefing, they repeatedly relied on arguments about the content of that advice. When you look at Ninth Circuit cases like Bitlani or Chevron, that's air. You can't use legal advice as a sword and then deny the opposing party the access to the advice because the opposing party can't adequately dispute the defense. So that's an additional specific grounds for reversal that I think has been deeply prejudicial to the litigation of the case. Thank you. Can I just ask you a couple of factual questions about the class? I just want to be sure I'm clear on who the members of the class are. So you are representing the ultimate consumers. And I take it because of Illinois BRIC you don't have a federal damages claim, so you're only asserting damages claims under the laws of those states that have not adopted Illinois BRIC? Yes, Your Honor. That's correct. We have an injunctive claim under the federal law and then we have monetary damage claims for certain states. And the requested injunction is purely prospective? That's right, Your Honor. So in terms of ultimate consumers who have maybe purchased the product in the past in states other than the states in your complaint, those people are not affected by this case at all? That is correct, Your Honor. Thank you. Thank you very much. Mr. Kuhlman. May it please the Court, Patrick Kuhlman on behalf of the United States. We're here today because the district court failed to apply the correct legal standard for analyzing business justifications in refusal-to-deal-with-rivals cases. And I'm going to lay out the correct legal standard and then I'll also talk a little bit about the balancing requirement that the panel asked my colleagues. After a plaintiff challenging a refusal-to-deal establishes a prima facie case, the defendant must proffer a valid and sufficient business justification. That's what the Supreme Court held in Kodak and that's what this Court has required. The district court, however, applied a different overly lax standard, one that did not require sufficiency. So the first Kodak requirement, validity, requires that a justification be pro-competitive in nature and non-protectual. The second Kodak requirement, sufficiency, requires that the justification have actual pro-competitive effect and then that actual pro-competitive effect outweighs the anti-competitive harm. The district court erred by asking me instead whether the refusal-to-deal was based in part on legitimate business reasons and that standard's wrong because at the very least it does not require sufficiency. Under that standard, a very slight pro-competitive benefit or an illusory pro-competitive benefit would excuse even massive harm to the economy. And as the Seventh Circuit rightly observed in Via Media, that would be an absurd outcome. Additionally, it's possible that a justification would be, that a refusal-to-deal would be based in part on a justification, even if that justification played only a negligible role in the decision. But this Court's Kodak remand decision, under this Court's Kodak remand decision, such a justification would be pretextual because that justification did not in any real sense actually motivate the conduct. Can I ask you to elaborate on the sufficiency requirement that you're taking from Kodak? Because, I mean, I agree Kodak uses the word sufficient, but it was not clear to me that they necessarily meant it in the sense that you're using it here. So can you explain how you get that requirement out of Kodak? Sure. Kodak evaluated both aspects of sufficiency. So the inventory cost justification, the Court held that there was a genuine issue of material fact as to whether that justification was sufficient because there was evidence that the plaintiffs presented that, in fact, it didn't actually save Kodak any inventory costs. And as to the balancing step, on page 486, the Court stated that at trial, it may turn out that the jury would find that the pro-competitive benefits outweigh the anti-competitive harms. And this Court has looked at sufficiency as well, too, in the sense that the justification was sufficient because it had the actual pro-competitive benefit of preventing an economic inefficiency. And the Court asked about balancing. Before you get to balancing, let me just ask you one question. The framework you just laid out, you primarily take from Kodak, right? From Kodak and from this Court's refusal to deal Presson's Oahu gas, the Kodak remand decision. So the framework you lay out, you believe, is based on a view of all the relevant cases. Is that correct? Yes. In other words, you don't contend, the government doesn't suggest in our cases that they're for some reason, they're off base? No, no, no. We think, no. Kodak, the Kodak decisions, the Oahu gas decision, Qualcomm, they're all consistent with the Supreme Court's Kodak decision. Okay. Thank you. And I can explain. It's just one example. In Oahu gas, I mentioned the sufficiency requirement. The Court also said that the justification must be legitimate, which is another way of saying valid. Then, in the Kodak remand decision, this Court stated that the justification must be nonprotextual and it must legitimately promote competition. If a justification doesn't have any actual procompetitive benefits, it hasn't actually promoted competition. Likewise, if the justification doesn't have actual procompetitive benefits that outweigh the anti-competitive harms, it hasn't promoted competition. You were going to say something about balancing, so please. Yeah. I'll just try to be very brief. But balancing is well established in refusal to deal jurisprudence. I mentioned the Kodak decision. I mentioned the seven circuits via media decision. There explains the important function that the balancing step addresses. And in Qualcomm, this Court indicated that the standard burden shifting framework for Section 2 cases, which includes the requirement that there be procompetitive effects and a balancing step, applies in refusal to deal cases. And the jury — let me just — I asked the question about plaintiff's counsel. The jury gets to make that decision? Yes. That would be — yes. Assuming there's a genuine issue of material fact. How do you instruct the jury on that? The jury would be instructed to determine whether — what the principal tendency of the conduct is to promote competition or to restrain competition, what the net effect of the restraint is, whether it's net procompetitive, net anti-competitive. Okay. Thank you. And we ask that the Court correct the legal errors in the district court's analysis, the business justification. We thank the Court for the opportunity to present our views. Mr. Chamagam. Thank you, Judge Miller, Canon Chamagam, and Paul Weiss for Align Technology. And may it please the Court, in this case, Judge Chabria correctly granted summary judgment to Align on plaintiff's refusal to deal and other claims. As to the refusal to deal claims, Align terminated interoperability for an unquestionably legitimate business reason, namely, protecting its patent rights. Align offered ample evidence that its termination was based on its concerns about defenses that 3Shape could and, in fact, did assert in the ongoing patent litigation. Now, plaintiffs primarily argue that that justification was pretextual. But the district court correctly concluded that plaintiffs presented no evidence of pretext, and plaintiffs were not entitled to pierce the attorney-client privilege solely because Align relied on that patent-related justification. Instead, I think what we've heard this morning is that plaintiffs and the government are really arguing for an expansive interpretation of the standard for refusal to deal claims. And that standard should be rejected. Now, I'll put aside for the moment plaintiffs' other claims and their efforts to aggregate those claims because I want to focus first on this question of the legal standard for refusal to deal claims. And, Judge Pius, to go to your question, let me explain how we think this should operate. Leaving aside the question of whether the plaintiffs have made a prima facie case, which is not before this court, we believe that the next step of the analysis is this question of whether or not there was a legitimate business justification. And as my colleagues on the other side have conceded, they conceded below. And I think that the law makes clear that where you have mixed motives, both an intent to harm a competitor, which, as courts have recognized, is essentially omnipresent in refusal to deal claims cases, but also a legitimate justification, that legitimate justification is sufficient. Sotomayor, why isn't that? You know, one thing that troubled me about the district court's decision is he just seemed to say that the strength of the evidence was sufficient for him to conclude as a matter of law that the just, you know, even though there may have been other motives, what was offered was sufficient to defeat their refusal to deal claims. And it struck me when I looked at the record here that there was, on that issue, at least at a minimum, there's a genuine dispute of fact about what happened. So I don't think that there was a genuine dispute of fact on the issue of pretext. But let me sort of frame this the way that I think it is supposed to operate, because I do think that the plaintiffs have sought to inject a number of other considerations into this that we think are legally irrelevant. So the legal just, the legitimate justification on which we relied was this justification concerning our patent rights. Now, what has this Court said about that justification? I would point the Court first to its decision on remand in the Kodak case. That's the 125F3rd decision. And what the Court said there, and I'm quoting, is that a firm's desire to exclude others from its intellectual property is a presumptively valid business justification. And the Court went on to say that that must be presumed to be legitimately procompetitive. Now, how can that presumption be rebutted? The Court said that there were two ways. First, if the defendant acquired its IP rights in an unlawful manner, which is not at issue here, or if the business justification is pretextual. So note that the Court said that that justification is presumptively procompetitive. The Court did not countenance any subsequent question concerning whether or not, in a particular case, the conduct of the defendant had procompetitive benefits. And we point to this Court's decision in Qualcomm, Freeman, and the ABA's model jury instructions themselves as supporting the proposition that you don't have to have an independent inquiry into that. Now, I want to leave aside for the moment the question of whether you have to then go on to balance procompetitive benefits against anticompetitive effects. That's a separate legal question. But my point, Judge Payes, is simply the reason they gave they need to protect their patent litigation is questionable because, really, the defenses that might be raised in that patent litigation, the experts said, actually help the defendant. So this justification just doesn't cut it. Why doesn't that raise a genuine fact, a tribal issue of fact, over whether it was a legitimate justification? I don't think that it does. And I think that Judge Chabria appropriately considered all of this in concluding that there was no genuine issue of material fact on pretext. And so that is the question that we're now discussing, is was there evidence that our stated justification was pretextual? And as I noted at the outset, there was abundant evidence that that was our stated justification at the time. And so then the question becomes, what evidence was there of pretext? There was no subjective evidence of pretext. There was no evidence that we believed that this patent justification was a ruse. There was no such evidence whatsoever. So then you're left with the expert testimony. And there was, in fact, a battle of the experts on this question of whether or not the termination of interoperability would have benefits in rebutting the defenses that 3Shape asserted. And I would note, parenthetically, Judge Paez, that there's no dispute about the fact that 3Shape had asserted the existence of interoperability as a basis for those equitable defenses. I would point the Court to Volume 2 of the Snow, Excerpts of Record of 193 and 198 to 199. Now, it is true that our expert did not opine on the ultimate legal question of the relevance of those defenses. And as we point out in our brief, that was entirely appropriate because of the familiar rule that experts can't testify on legal conclusions. But my broader point is that this expert testimony, in some sense, was not particularly relevant. This was evidence as to the strength of the argument that this termination affected the patent defenses, to be sure. But the ultimate question here is, was this pretextual? Was this, in fact, not our justification? But isn't the strength of the defense? I mean, it seems like it's at least circumstantial evidence. If it is, in fact, true that ending interoperability did not improve your position in the litigation, that might be a reason from which one could infer that you didn't really have that motive, right? I actually don't really agree with that, with respect, Judge Miller, for the simple reason that, you know, you could have a situation where even if there was the most marginal impact on the patent defenses, because of the importance of the patent litigation to the company, the company could nevertheless say, we're going to do everything in our power to strengthen our patent case. And so I actually don't think that the strength of the arguments is really direct evidence of that. Now, maybe if you had a situation where somebody said, you know, this is completely frivolous, it might be different, but I don't think this is actually that situation. And the best evidence of that, of course, is the fact that 3Shape had asserted interoperability in support of its patent defenses here. And, of course, all of this was before Judge Chabria and Judge Chabria ultimately reached the conclusion that there was simply no evidence of pretext here. Now, I do think that there's a lot of back and forth about, you know, is this an objective standard or a subjective standard? Before the district court, we made the more ambitious argument that this standard is really a standard of conceivability, if you have a conceivable rationale that is sufficient. And Judge Chabria rejected that. But then we, of course, also were content with a standard that is a subjective standard, a standard under which you look to the intent of the party. We were very careful in articulating our arguments, not to do anything that would put the advice that we had gotten from counsel into play. And those are the statements. Before you get further into the advice of counsel question, in terms of the standard that you're advocating, so if you imagine a situation where the refusal to deal is motivated in significant part by the desire to harm the competitor, and there's a big harm to the competitor, and that's a main part of the reason they're doing it. But they are also motivated in part by some legitimate pro-competitive reason. And that's a genuine reason, but it's a fairly small one. So you have big anti-competitive effect, that's most of the reason, and then this little other reason. I guess your view is that there's no claim in that situation? Yeah, so I think that there are three points of potential legal disagreement, and the first is the one that you have mentioned, which is the primary argument that I understand the government to be making, which is this sort of predominant or primary purpose test. Now, I would submit first that I don't think that that test has any footing in the refusal to deal context. I don't think that this court or the Supreme Court has said anything to a support and approach where you try to determine which purpose was the driving purpose. I would also say that I'm not sure that that standard is a terribly administrable one, and I think it is a standard that would almost of necessity require a jury to try to make that sort of determination. But I think, quite to the contrary, the case law, and we would rely primarily on this court's decision in Oahu Gas, which I think is the primary authority that addresses so-called mixed motive cases directly. It contains no support for this notion that you are weighing the strength of the purposes. Instead, it simply says, consistent with the Supreme Court's case law, that where you have a legitimate justification, that is sufficient. Now, I really understand the plaintiffs to be making two different legal arguments, and I want to make clear the points of disagreement so that we can fully vet them. The first is this notion that once you articulate the justification, you've got to make an independent showing as a defendant that that justification has pro-competitive benefits in a particular case. And again, I'm content to rely on what this court has said about this particular justification as being presumptively pro-competitive in Kodak, and also cases like Qualcomm and Freeman, which I think stand for the broader proposition that once you have a legitimate business justification, you don't do that. But then I do want to address the third point of legal disagreement, which is this notion that you engage in balancing in refusal-to-deal cases. We would submit that there is no support for that. I would point the court not only to this court's decisions in Freeman and High Tech Careers and the Kodak remand decision at Wahoo Gas, but also to Areta and Hovenkamp, the Weeding Antitrust Treatise, for the proposition that that sort of balancing should not take place in a Section 2 refusal-to-deal case. Now, why not? I think that the best explanation for why that doesn't take place is what the Supreme Court said in its most recent pronouncement on refusals-to-deal in Trinco, which is that, of course, refusal-to-deal liability is an exception. It's an exception to the familiar rule that businesses are free to choose the parties with whom they will deal. And precisely because the Aspen skiing exception is at or near the outer boundary of Section 2 liability, it operates somewhat differently. And to the extent that the other side has pointed to anything in the case law to try to get a foothold for this, the two cases on which they rely are this Court's decision in Qualcomm, and then today Mr. Kuhlman also cited the final paragraph of the Supreme Court's majority opinion in Kodak. Both of those are cases where the Court simply stated the general principle that you have this three-step framework in antitrust rule of reason cases, the third step of which is balancing. But those were both cases in which the Court did so either in an introduction or in a conclusion in cases where there were both Section 1 and Section 2 claims and where you therefore had a broad array of different types of antitrust theories. With regard to refusal-to-deal claims specifically, the other side doesn't point to any case, either from the Supreme Court or from this Court, where the Court has engaged in that sort of analysis once you have a legitimate business justification. I take the point that under Trinko, this is a very narrow category of claims, but it seems like under your test, I'm having trouble imagining how any plaintiff would ever get past summary judgment because it seems like you practically always have some legitimate business justification that you can articulate. It doesn't matter under your test if the pro-competitive effects were big or small. It doesn't matter if it was a big part of your reasoning or not. Unless they can come up with some evidence that it's just a lie and you weren't thinking about that at all, the defendant gets summary judgment, right? Well, Judge Miller, and this goes back to the point I was making to Judge Paez, we pushed for a sort of rational basis-type standard where having a conceivable justification was sufficient, and we relied on this Court's decision in Aerotech. Judge Chabria rejected that and instead said, you've got to come forward as a defendant with evidence that you, in fact, possess this justification. And the good news for us was that we had abundant such evidence. We had evidence, going back to our original announcement at the time that we terminated, that we were doing it due to Three Shapes infringing conduct and resulting litigation. That's a 20-25 of the Snow record excerpts. Three Shape itself acknowledged that the reason why a line had terminated was in order to raise the patent case with the ITC. That's at 1664. And it's a very familiar thing for plaintiffs to rebut justifications with evidence of pretext. The plaintiffs here had extensive discovery. They had access to all sorts of communications, to PowerPoints and the like. They relied on those to show an intent to harm competitors. But they couldn't point to anything to suggest pretext. And at the summary judgment hearing, Judge Chabria repeatedly pressed the plaintiffs in this regard. And the most they could come up with was their expert testimony, which, again, I think is a very thin reed to create a genuine issue of material fact when the ultimate question is not how strong was the patent case. This is not a case-within-a-case situation, but rather what was our intent in conducting the termination. And I would say, just to sort of close the loop on this issue of pretext, that with regard to the attorney-client privilege, on which my friends on the other side briefly relied at argument today, I think the key point is that we did not put the advice of counsel into play in the familiar way that you have to in order to give rise to piercing the privilege. The most they can rely on is a statement made by the CEO that he was supplied with information that he should terminate interoperability because of the patent litigation. But we consistently made clear that we were not relying on that advice, that we were not relying on subjective evidence as to the strength of the merits of the patent claims in proceedings before the district court. Instead, we simply were relying on evidence, including contemporaneous evidence, as to why we terminated, and particularly in a context where it was clear that the others did that. I don't mean to interrupt you. I'm sorry to interrupt you, but your time is running out. I just want to ask you, interject a question in your point there. Why, you know, the trier fact, I'm sure the plaintiffs will get to tell the story, sure, you may have terminated the interoperability arrangement, but that was a losing proposition for them. They lost tons of money. And if you look at that and you look at our expert, this whole reason they're given about terminating or raising the patent, you know, to protect their patent litigation, it's just a hoax. Why wouldn't that be enough for a jury to say, Yeah, you look at all the evidence and it's, you know, there's a factual dispute here and it's all just a hoax. They just wanted to get rid of 3Magic. I think there are sort of two critical points in response to that, Judge Pius. The first is that to the extent that they point to evidence of losses, that is to establish their prima facie case, which is that we forewent short-term benefits to reduce long-term competition. When you talk about, when you talk about, I'm just thinking about how this would play out at a trial, right? I mean, people think in terms of prima facie and whatnot. They have the burden at trial to prove that there was a Section 2 violation. Correct. You know, that's their burden. They've got to come forward with evidence at trial. They've got to really put it forward, right? Correct. And, you know, once they have carried their initial burden, and I think Judge Shabria could not have been clearer about this because he addresses it in, you know, the second paragraph of his opinion, at that point, you know, where you have a refusal to deal that is based in part on legitimate business reasons, it does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors. Now, where am I taking that quote from? That's actually from the ABA's model jury instructions. And while the government disparages the ABA in this context, I think it accurately reflects the case law, including in this circuit, where we have Oahu Gas, which literally rejected a jury instruction that said that it's an either-or proposition where if you have an intent to harm competitors, that is sufficient. And I really do want to just underscore one thing, which is that the case law is sort of replete with statements about the fact that an intent to harm competitors is not enough. I would point the Court to, among other things, the Sixth Circuit's decision, Judge Sutton's decision in the St. Luke's case, which makes the point that every shrewd business person intends to beat her competitors. And that's precisely why we have a legal standard that says if you can identify a legitimate business justification that you in fact possessed, that is sufficient. And then when you get to the question of pretext, again, that's a familiar question from all sorts of contexts across the law. It is the plaintiff's burden to come forward with evidence that you did not in fact possess that justification. And I see that my time is very short, so I think the last thing I would say is that to the extent that the plaintiff well, I would say two things very quickly. The first is that I do want to just reiterate the fact that we make the point that this is a case in which we were not selling interoperability in an existing market, and this was not a case in which there was an extensive course of dealing in the way that there was in cases such as Aspen Skiing. Those are factors that we believe also point in the direction of a conclusion that there was no invalid refusal to deal here. But then in my remaining four seconds, I would say that with regard to the remaining claims here, the bundling claim and the exclusive dealing claim, we don't think that those claims can permissibly be aggregated with the refusal to deal claim. And so if this Court concludes that Judge Chabria got it correct in saying that there was not a standalone refusal to deal claim, we don't think that the other theories can be added together, both because any freestanding claims on those theories were forfeited and because we don't believe that the plaintiffs can meet the requirements for freestanding claims. And I think that this Court has made clear that it is not possible to aggregate those sorts of claims in the way that the Fourth Circuit recently suggested in the Duke Energy case that plaintiffs potentially could. So I meant to ask you about Duke Energy. So your view is that the Circuit has already rejected the approach taken in that case? Our view is that this Court has rejected that approach, but at a minimum, if there is any context in which that approach is appropriate, I would say that it's in a context in which you can appropriately aggregate anti-competitive effects. And precisely because a refusal to deal claim does not turn on the existence of anti-competitive effects because it does not have a balancing component, we don't think that that can be aggregated with other theories. And I would point this Court to Judge Bozberg's decision, which we cite in the Facebook case, which I think very lucidly lays that out. And what's the best case from this Circuit that you think reflects a different approach? Well, I actually think that this Court's decision in Anaheim actually helps us and it doesn't help the other side because I think at most this Court recognized that aggregation might be appropriate in a context where anti-competitive effects are relevant on multiple theories, and of course there the Court ultimately rejected the claim. Thank you. Great, thank you. Your butthole. Thank you, Your Honours. I'm going to try to go very quickly because there's much to cover and much that I think has been mischaracterized. On the pretext issue, below, completely rewritten now, what Align, in fact, argued was it was not going to rely on subjective evidence of its own beliefs, it was going to rely on only two sources. One, evidence from 3Shape, and two, objective evidence from experts. And that's at 6 Simon ER 1348. As to 3Shape, Align ignores the actual evidence from 3Shape, which is copious, where it explicitly said repeatedly after this conference of orthodontists, where Align had said we had to do this because we had to cut off 3Shape because of the patent litigation regarding scanners. 3Shape was furious and said that is absolutely not true. There is no basis, no basis for Align to have to cut off interoperability. That alone should give rise to a genuine dispute of material fact. What about the other issue, the experts? There is no – I cannot – this is an extraordinary case. I have been doing this sort of work for decades. Our experts agree on the pertinent issues, and to the extent they don't, their expert chose not to opine. In paragraph 67 of Mr. Stoll's expert report, he says, the quote, unquote, relevant inquiry, end quote, is the effect of the refusal to deal on Align's scanner patent rights. In paragraph 56, he says, I express no opinion on that issue. They've tried to repackage that as some sort of appropriate restraint. He identified the relevant issue, and he did not opine on it. Our expert agreed on the relevant issue and then walked through all the elements of the various equitable defenses and explained why it's not that they're debatable. There's no grounds whatsoever to say that the refusal to deal strengthened Align's patent position. Now, I don't have time to walk through those, but I want to point out below we walked through those elements and explained it. Align never touched them. In their briefs, they've never explained it. In their brief on appeal, they mention by name on pages 10 and 28 of their brief two equitable defenses. Not once did they ever say, here are the elements of the equitable defense and here's why it is non-frivolous to say that the refusal to deal actually strengthened Align's scanner patent rights. And today, we didn't hear a wisp of it either. Smoke and mirrors. Now, why does that matter? If we are right and all the evidence does, in fact, point in our direction, two things follow from it. First of all, one thing that follows is there are no pro-competitive effects here. It is not enough to say, oh, well, we believe this issue. Empty head, pure heart is not a defense for an anti-competitive refusal to deal. And I want to take the words because we've traveled so far from the actual law. I'm going to take the words from the Ninth Circuit in Eastman Kodak. Briefly, please. Yes. A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition. In other words, it doesn't have pro-competitive effects. That is what we are showing, or that it's pretextual. And we have done both. So as a result, summary judgment was wholly inappropriate in this case, and the Court never addressed those relevant issues. Thank you very much. We thank all counsel for their helpful arguments, and the case is submitted.
judges: THOMAS, PAEZ, MILLER